
# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs February 15, 2017

## STATE OF TENNESSEE v. DEQUAN HASANI BERTRAND

**Appeal from the Criminal Court for Davidson County**
**No. 2013-D-3070     J. Randall Wyatt, Jr., Judge**

_____

### No. M2016-00920-CCA-R3-CD

_____

A Davidson County jury convicted the Defendant, Dequan Hasani Bertrand, of aggravated robbery, aggravated burglary, and employment of a firearm during the commission of a dangerous felony. The jury acquitted the Defendant of one count of aggravated rape and was unable to reach a verdict as to two other counts of aggravated rape. The trial court sentenced the Defendant to a total effective sentence of twenty-four years. On appeal, the Defendant contends that: (1) the trial court erred when it admitted the victim's identification of him; (2) the evidence is insufficient to sustain his convictions; and (3) the trial court erred when it sentenced him to the maximum sentences within his range and ordered his sentences to run consecutively. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and TIMOTHY L. EASTER, J., joined.

Frank T. McLeod (at trial), and Joshua L. Brand (on appeal), Nashville, Tennessee, for the appellant, Dequan Hasani Bertrand.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Amy M. Hunter, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from a robbery that occurred on October 15, 2013, at the home of

1

the victim, K.T.[1]  With regard to the events surrounding this incident, a Davidson County grand jury indicted the Defendant for three counts of aggravated rape, one count of aggravated robbery, one count of aggravated burglary, one count of employing a firearm during the commission of a dangerous felony, and one count of attempted aggravated robbery.

## A. Suppression Hearing

The Defendant filed a motion to suppress the victim's identification of him.  The Defendant alleged that the day after the offense, October 16, 2013, a law enforcement officer showed the victim a photographic lineup containing pictures of six men, including the Defendant, whom all looked similar.  The victim was unable to identify any of the pictures as being of the man who had robbed her.  The Defendant further stated that, two days later, on October 18, 2013, law enforcement officers showed the victim a second photographic lineup.  This second line up, he posited, contained pictures of six men that did not look similar to each other.  From this lineup, the victim immediately and definitively identified the Defendant's picture as being of the man who had attacked her.  The Defendant alleged that the second lineup was clearly suggestive and that the victim's identification was inadmissible.

The trial court held a hearing on the motion, during which the parties presented the following evidence:  Michael Bennett, a detective with the Nashville Metropolitan Police Department, testified that he investigated the events in this case.  As part of his investigation, he developed a photo lineup to show the victim.  The detective said that the Defendant did not have a booking photograph available to use to develop the photo lineup, so the detective accessed the Defendant's driver's license photograph.  He then took the physical description of the Defendant and searched booking photographs for five other men who looked similar to the Defendant.  Detective Bennett said that, therefore, the lineup that he showed to the victim had one driver's license picture and five booking photograph pictures.

Detective Bennett testified that he showed the lineup to the victim the day after the incident.  He explained the standard instructions to her before showing the victim the lineup.  He stated that the victim looked at the lineup for approximately forty minutes, but she was unable to identify any of the pictures as being of her assailant.  The detective noted that the Defendant's picture was in position number three.

During cross-examination, Detective Bennett testified that he did not use hair style or complexion to develop his photo array.  He said that he simply looked for photographs

---

1 To protect her privacy, we will refer to the victim by her initials only.

2

of men that looked similar to the Defendant.

Detective Andrew Vallee testified that he also compiled a photo lineup to show to the victim. He was unsure whether he knew, at that time, that Detective Bennett had previously shown her a photographic lineup, but he believed that the two had not discussed this matter before Detective Vallee created his lineup. He explained that, within the department, some cases were investigated by two separate divisions. For example, in cases involving a rape and a robbery allegation, the Sex Crimes Unit handled the rape investigation, and the Precinct Investigation Unit handled the robbery portion of the investigation. There were, therefore, actually two separate investigations being conducted simultaneously.

Detective Vallee testified about creating the photo lineup. He said that the Defendant did not have an available booking photograph, so the detective retrieved the Defendant's driver's license photograph from the Tennessee Criminal Justice portal. The detective noted that the Defendant had available several photographs, and he did not remember if he chose the most recent photograph. He found it unsurprising that he and Detective Bennett had chosen different photographs. The detective testified that, because he wanted to show the victim a color lineup and because he wanted to have the pictures appear with similar backgrounds, he then manually chose five other driver's license photographs. Detective Vallee said that he attempted to choose men of similar age and weight. He said he attempted to choose some men with similar hair and that "[he] did the best [he] could with that."

Detective Vallee testified that he showed the photo lineup to the victim, and she immediately identified the Defendant's photograph as being of the man who assaulted her.

During cross-examination, Detective Vallee testified that he did not recall whether he interviewed the victim before he compiled the lineup. The detective agreed that, of the men in the photo lineup, one was bald and two had short hair. The detective agreed that it was "possibl[e]" that he spoke with Detective Bennett before he compiled his photo lineup but that he did not remember.

The victim testified that she worked in the fitness industry and that, as she was preparing to leave her home to go to work on October 15, 2013, she was sexually assaulted and robbed. She said that it was around 4:15 p.m., and she had gone to her car parked in the driveway only to see that she had left her garage door open. She returned to the house quickly to shut the garage door, leaving the front door of her house open. On her way back to her front door she saw a man whom she had never seen before on her front porch. She said that the area was well-illuminated and that she told the man

something to the affect of "stay right there." The man came into the house and walked behind her.

The victim described her living room as fifteen feet wide, and she said that she was looking at the man's face as he walked towards her across that distance. She estimated that she viewed him for a total of five to six seconds before he was behind her. After he was behind her, he told her not to look at him, and she complied. The victim said that, after the assault, her fiancé called the police who responded to the scene.

The victim testified that Detective Bennett showed her a photographic lineup on October 16, the day after the assault. She said she was unable to identify any of the pictures as belonging to her assailant. She explained that there were two pictures that she could not decide between, photographs number three and four. The victim said that she was 95% certain that her assailant was the person in photograph number three, the Defendant, but that she did not identify him because she was not 100% certain. The victim explained that, in this photo lineup, the Defendant was smiling in his photograph which "thr[ew] her off" because in the image she had in her mind the Defendant was not smiling.

The victim recalled that Detective Vallee showed her another photo lineup on October 18, 2013. In this lineup, the Defendant was not smiling in the photograph. She immediately identified the Defendant's picture as being of the man who had assaulted her.

During cross-examination, the victim testified that she was shown a total of three photographic lineups. The first, she said, did not contain the Defendant's picture, and she did not identify anyone. The second contained the Defendant's photograph, and she was 95% certain that he was the perpetrator. In the third, she identified a photograph of the Defendant.

Based upon this evidence, the trial court issued a written order denying the motion to suppress. It found:

> In this case, the Court finds that the victim was asked on multiple occasions if she could identify any individual in the photographic lineups as the man who attacked her. The Court finds that there was no evidence that either of the detectives prompted or indicated to the victim who she should choose out of the lineups. To the contrary, the Court finds that both detectives followed the proper lineup procedure to the letter. The Court finds that the detectives never led the victim to choose a particular person in the lineup, or even suggested that a suspect was included. The Court

4

acknowledges that the victim vacillated somewhat between some of the photos on October 16. However, the Court finds that this was due to the Defendant appearing different in the photo than he did on the day of the offense. The Court finds that when the victim was presented with a lineup that included a photo of the Defendant where he looked more similar to the way he looked on the day of the offense, the victim immediately identified him. The Court finds that the detectives allowed the victim to reach a decision on her own. The Court does note that the second lineup on October 16 apparently included a photo of the Defendant wherein the background appeared different than the backgrounds in the other photos because the detective used a driver's license photo for the Defendant and "mug shots" for the other men. However, the victim did not identify the Defendant in this particular lineup, and the Court finds that it had no effect on the victim's identification of the Defendant on October 18. In light of all of the circumstances of the identification, the Court finds no evidence of coaching or prompting of the victim to make an identification in this case, and the Court finds that the identification procedure was not unduly suggestive.

While the Court finds that the identification was not unduly suggestive, the Court also finds that the identification passes the 'totality of the circumstances' test established in Biggers [409 U.S. 188, 199-200 (1972)]. The factors to be considered under Biggers are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Biggers, 409 U.S. at 199-200, 93 S. Ct. at 382.

The Court finds that the victim in this case had a short time to view the Defendant's face at the time of the crime. However, the Court finds in the seconds she was able to view his face, her full attention was focused on him. The Court also notes that the lighting in the room where the crime occurred, as well as the fact that the Defendant had to walk straight toward the victim for a distance of about 15 feet, allowed the victim to get a very good look at the Defendant's face. The victim was unable to give a detailed physical description of the Defendant, but there is no evidence that the description she was able to give was inaccurate in any way. The Court also finds that when she was able to identify the Defendant, the victim was absolutely certain that he was the man who attacked her. The Court credits her testimony and finds that when she was uncertain, she declined to

5

identify the Defendant or anyone else. Finally, the Court notes that the crime is alleged to have occurred on October 15, 2013. The victim first viewed a lineup the next day, and positively identified the Defendant three days later on October 18. Under all of these circumstances, the Court finds that the victim's identification of the Defendant was reliable.

## B. Trial

At trial, the parties presented the following evidence: The victim testified that, at the time of these events, she lived in Davidson County and worked as a personal trainer. This assault occurred as she was leaving her house on October 15, 2013, to go to a gym in Hendersonville for a personal training appointment. The victim said that she left her house and got into her car. She remembered that she had left the door between the garage and her house open, so she went back into her house to close that door. When she went in the front door, she did not close it because she was going into the house briefly. The victim said that, after she closed the garage door, she noticed out of the "corner of [her] eye" that there was a man, whom she identified as the Defendant, on her front porch. She said he was wearing a loose knit hat and dark clothing

The victim testified that she said to the Defendant, "Can I help you?" and then told him to "wait right there." She said that she began crossing the living room toward the front door, and the Defendant opened the screen door at which point the victim noticed that he had a gun. The Defendant walked towards her, came around behind her, and took her phone out of her hands. She saw that the Defendant had "longer" hair that he wore in braids pulled back from his face. He then put his hands over her mouth and began asking her questions. He asked her if there was anyone else in the house, and the victim responded that there was not. The Defendant was "[v]ery serious" and told her that if there was anyone else in the house he would kill them and then kill her, threats that she believed.

The victim said that the Defendant then told her to get down on the floor of the living room, and she got down onto her knees and elbows. The Defendant told her to get all the way down, and she lay down on her belly on the floor with her face towards the floor. The Defendant told her not to move or he would kill her, and he suggested that there was someone outside. The Defendant told her, "You stay here, if you go outside he'll kill you, if I don't get to you first." The Defendant went to the front door and called out to someone, saying "Rue." The victim said that she never heard another man's voice, and she never saw a second person.

The victim said that the Defendant went upstairs and was gone for three or four minutes. She heard him walking back and forth, but she was still scared to move, fearing

6

that there was someone outside who might kill her. The Defendant came back downstairs and asked if she had a boyfriend, so she told him that she had a fiancé. The Defendant then pulled down her shorts, and the victim informed him that she was menstruating. The Defendant said, "That is okay. I will find other things to do."

The victim testified that, at that point, the Defendant brought her to her knees, and he put his penis in her mouth. He told her to put it all the way in her mouth and not to bite. She said that he kept pushing her head down farther and farther onto his erect penis. The victim said that she did not think the Defendant ejaculated. She said that, immediately after the incident, she told medical providers and police more details but that, after so much time, it was hard for her to remember some of those details.

The victim said that the Defendant went to the kitchen sink and then returned to her. He again forced his penis into her mouth, and he had one of his hands on the back of her head. She noticed at that point that he had a black glove on his other hand and that there was a skeleton design on the glove. She identified a photograph of this glove for the jury. The victim said that the Defendant forced her to crawl into a nearby half bath and told her to stay there for twenty minutes or until her fiancé returned. She said that she stayed in the bathroom until her fiancé returned to her home, which was about five minutes after the Defendant left.

The victim testified that, when her fiancé arrived, he called 911. She got a glass and started spitting into it in hopes of preserving evidence. Later, she noted that there were several items missing: a guitar; two laptops; her purse; an orange Columbia backpack; and a pair of earrings. Her car was also missing from her driveway.

The victim said that the police responded quickly to the 911 call, and they transported her to the hospital for a medical exam. She gave the medical personnel truthful answers and endured the physical examination. The victim said that she returned home only briefly and then went to a friend's house to stay for a while.

The victim recalled that, the following day, her throat and her anus were both sore. Also that day, Detective Wiser showed her a photographic lineup. The Defendant's photograph was not among the pictures, and she did not identify anyone. Detective Bennett then showed her a second photographic lineup. In this lineup, there were photographs of two men who seemed familiar to her, one of which was of the Defendant. She said that the Defendant was smiling in his photograph so that, while he looked "very familiar," the smile made her unable to positively identify him as her assailant, even after viewing the lineup for more than twenty minutes.

The victim said that, on October 18, 2013, Detective Vallee showed her a third

7

photographic lineup. She immediately identified the Defendant's photograph as being of her assailant. She stated that she was 100% certain that it was him, and she noted that he was not smiling in this photograph.

During cross-examination, the victim testified that when she described her attacker to the police, she said he was dark-skinned. She said that his hair was shoulder length and pulled back. She also said that he had an "awful smell" and a "foreign accent," possibly an African accent. She said that the attacker's voice was "normal" at first and then changed into a voice with an accent. The victim said she told police that her attacker was younger than she was, maybe in his later twenties, taller than she was, and "skinny." The victim agreed that she told police that she was terrible at physically describing someone. She also agreed that she only saw her attacker for four or five seconds and that she could not identify him in the photographic lineup shown to her by Detective Bennett.

The victim agreed that she told the police that her assailant was circumcised. The victim said that she attended counseling to help her process this assault. The victim said that she had initially told the police that she had been penetrated anally but that she no longer was sure that this had occurred.

During redirect examination, the victim testified that she believed that the person who appeared in her doorway was the same man who forced her to perform oral sex upon him. She said, however, she did not look at his face again. She further said that there were times that her assailant held the gun to her rib cage, but she did not recall when during the "ordeal" this occurred.

Pamela Crues, a family nurse practitioner, testified that she worked in the emergency room of General Hospital conducting sexual assault examinations. She examined the victim on October 15, 2013, at around 8:18 p.m., and the examination took until 10:30 p.m. Ms. Crues testified that the victim gave her an account of what had occurred, and it comported largely with the victim's trial testimony. Ms. Crues said that the victim detailed how her assailant put his penis in her mouth and "toyed with the idea of putting it in her bottom." She said that he may have put the tip in her "bottom" but then he again placed his penis in her mouth. When Ms. Crues asked the victim specifically about penetration, the victim said that her assailant had penetrated her mouth and anus. The victim told Ms. Crues that the man had not ejaculated. During cross-examination, Ms. Crues testified that the victim did not have any signs of physical trauma. She agreed that the victim refused the HIV medication and declined counseling services offered to her. During redirect examination, Ms. Crues said that the lack of trauma to the victim's anus was not unexpected given the victim's account of the assault.

Paul Nies, an officer with the Metropolitan Nashville Police Department, testified

8

that he responded to the call in this case between 4:00 p.m. and 5:00 p.m. on October 15, 2013. He said that, before responding, he had also received a call about a suspicious person. He recalled that an anonymous citizen called 911 to report that there were some individuals parked in front of their apartment. The citizen reported seeing the individuals going in and out of the side yard, which the citizen found unusual. Officer Nies said that, when he arrived, Officer Kelly was already interviewing an individual that was standing outside of a tan Buick Century. The individual and others with him did not want to provide their names. One of the individuals eventually gave Officer Kelly his driver's license, telling him that he had run out of gas, which was why he was parked in that area. The other man did not provide his correct identity. The two men said that they were going to go to a bus stop and catch a bus.

Officer Nies said that he was disturbed by the interaction with these two men. He said that when individuals were not forthcoming with their identities, officers suspected that there was something more amiss. Officer Nies recalled that, within thirty minutes of this interaction, he responded to a call about a home invasion. He spoke to the victim, who relayed to him what had happened, including that she had been raped and sodomized. The officer said that, after speaking with the victim, he looked around outside her home. Outside the house near a crawl space he found a silver handgun. He informed other officers investigating the case about the location of the weapon.

During cross-examination, Officer Neis testified that the Defendant was not one of the two men present when he responded to the Buick.

Officer James Kelly, with the Metropolitan Nashville Police Department, testified that before he responded to the victim's rape call, he had responded to a call that there was a gold sedan with "numerous male black subjects inside or just outside of it walking around." The caller said that it appeared that the men were "casing" the neighborhood. When Officer Kelly arrived at the sedan's location, he saw a gold four-door Buick Century sedan. There was one black man in the back seat, who appeared "very nervous," because he was looking around and appeared to be looking for someone. The man exited the vehicle immediately upon the officer's arrival, appeared very nervous and very defensive. The man told the officer that the officer could not stop him. The officer told the man that he was simply checking on his welfare. He recalled that there was a gas station approximately 100 feet from where the sedan was parked.

Officer Kelly said that he spoke with the man for a few minutes, and the man identified himself as "Brian Willis" but refused to provide any other information about himself. The officer said that, at that point, another man named Ivy Dobson came around from behind the apartment complex in front of which the sedan was parked. Mr. Dobson said that he was with the man who identified himself as Mr. Willis. Mr. Dobson

9

provided the officer with his identification, which the officer verified.

Officer Kelly said that the two men began talking and appeared "extremely nervous." The men kept repeating, "[W]here's Quan?" When Officer Kelly asked who Quan was, they replied that he was their friend who had picked them up earlier in the sedan. Officer Kelly recalled that the sedan had Ohio license tags and that the registration was current but that the registration did not match the car. The men informed him that the car was out of gas, so they left the vehicle and went toward a bus stop.

Officer Kelly testified that he went to an area to fill out a report about the interaction and that, within fifteen minutes, he received the call about the victim's home invasion.

During cross-examination, Officer Kelly said that he told both men that they were free to leave.

Ivy Larue Dobson II testified that he was twenty-one years old at the time of trial and that he had attended Middle College High School. He said that he had known the Defendant since their freshman year of high school, even though they went to different high schools, because they both played on the same team for summer league basketball. Mr. Dobson said he got to know the Defendant "a good amount," and the two frequently spent time together.

Mr. Dobson testified that he and the Defendant had both been charged with aggravated robbery and aggravated burglary with regard to the home invasion of the victim's home. Mr. Dobson said that he was not, however, charged with the rape offenses. He agreed that, because he was a co-defendant, his testimony may be questioned, but he stated that he desired only to tell the truth, not having been offered anything in exchange for his testimony.

Mr. Dobson recalled the events that occurred on October 15, 2013. He stated that, at the time, he worked concessions at Bridgestone Arena and lived at home with his parents. He said that he had taken a break from school at Tennessee State University ("TSU") but that he returned to school the following semester. Early in the day on October 15, Mr. Dobson spent time with his girlfriend, Ashton Williams, at TSU. In the afternoon, the Defendant and Brian Frelix, whom Mr. Dobson knew from college, picked him up from TSU in a gold Buick. Mr. Dobson recalled that Mr. Frelix was driving and that the Defendant was sitting in the front passenger seat. When Mr. Dobson got into the car, he sat in the backseat.

Mr. Dobson said that he thought the plan was for them to go to a music studio

10

where he had been previously with Mr. Frelix to record music. Mr. Frelix was pursuing a career in the music industry while at TSU. Mr. Dobson said that, after the two men picked him up, they traveled to Mt. Juliet. He said that this was not the location of the music studio, so Mr. Dobson asked what they were doing and if the men could take him back to TSU. He described Mr. Frelix and the Defendant as "being real quiet and real sketchy." Mr. Dobson said that the men then went to Opry Mills and, after that, they drove to Spence Lane.

Mr. Dobson said that the car ran out of gas on Spence Lane, and the men were frustrated with Mr. Dobson for "not cooperating." Attempting to determine what to do next, the men discussed obtaining money through criminal means, which Mr. Dobson found absurd because the men had jobs with "great" income and great families. He found this discussion "really . . . random." Mr. Dobson noted that, during this car ride, both Mr. Frelix and the Defendant were consuming a purple liquid drug out of baby bottles that they were calling "Pluto." They offered the drug to Mr. Dobson, but he declined. Mr. Dobson found the men's behavior out of character and "very very weird." He noted that the Defendant was the prom king at his high school and attended Hampton University. He said that Mr. Frelix was a "church going guy who did very well in music."

Mr. Dobson said that, after the men parked the car when it ran out of gas, he saw that Mr. Frelix and the Defendant each had a gun. The Defendant handed Mr. Dobson a silver gun and encouraged him to commit various crimes. Mr. Dobson said that he declined for several reasons, one of which was that he had a date at 6:00 p.m. Mr. Dobson recalled that, after handing him the gun, the Defendant got a "small revolver" from Mr. Frelix. Mr. Frelix and the Defendant became frustrated with Mr. Dobson for not being willing to participate in criminal activity. The Defendant then got out of the car "really fast" and said he was going to get the gas money. Mr. Dobson said that he then exited the vehicle, looked for the Defendant, and saw him on the steps of "some apartment." Mr. Dobson said that, at that point, he saw the policeman by the car. Mr. Dobson said he "got real scared and nervous," so he put his gun under the hole on the side of the apartment and headed toward the officers to speak with them. Mr. Dobson identified photographs of the gun that the Defendant handed to him. He said that, at the time, the gun had no bullets or a clip inside the weapon.

Mr. Dobson said that, when he spoke with the officers, he told them the direction that the Defendant had headed and that he did not see the Defendant again at that point. The Defendant did not return during the time that Mr. Dobson spoke with police. Mr. Dobson noted that he only briefly saw the Defendant on the steps of the apartment because, as soon as he saw the Defendant on the steps, he saw police speaking with Mr. Frelix. Mr. Dobson said that he knew that Mr. Frelix was going to give the police officers "a little bit of trouble" because of Mr. Frelix's history and past, so he returned to

the vehicle as fast as possible. Mr. Dobson said that Mr. Frelix was not forthcoming with the police officers about his true identity. The officers asked Mr. Dobson to get Mr. Frelix to cooperate.

Mr. Dobson said that the officers asked them how many people were with them, and Mr. Dobson told them three, the third being their friend "Quan." The officers then asked where the third man was, and Mr. Dobson told them that the Defendant had gone to look for gas and would return shortly. Mr. Dobson said that he fully cooperated with the police officers, even though he did not tell them at which apartment he had last seen the Defendant standing on the steps. He explained that he did not know the Defendant's plan, so they just told the officers the direction in which the Defendant had gone.

Mr. Dobson described the manner in which the Defendant was dressed on the day of the incident, saying that he had on khaki pants and a black hoodie. He wore a "Rasta" style hat from which fake dreadlocks were protruding. At the time, the Defendant's hair was actually short, but it appeared as if he had braids when he wore the hat.

Mr. Dobson said that, after speaking with police, he and Mr. Frelix walked to a bus stop and the officers appeared to be preparing to leave the Buick. Mr. Dobson said they took a bus to downtown Nashville. He explained that he and Mr. Frelix had no money, so the bus driver said she would take them only as far as downtown. The two then walked from downtown back to TSU, which took an extended period of time. He estimated that they returned to TSU around 6:00 p.m. Mr. Dobson said that he went on his date with his girlfriend to the movies, accompanied by his mother.

Mr. Dobson testified that he did not hear from the Defendant that evening or the following day. On October 17, 2013, his family saw a news story about the incident, and the story identified him as a suspect. He contacted the police and surrendered himself for questioning. Mr. Dobson testified that he spoke with multiple law enforcement officers and that he told them the same version of events to which he had testified. He said that he worked with officers in an attempt to speak with the Defendant over the phone to find out what had happened. They could never contact the Defendant.

Mr. Dobson said that, at some point after his first interview with law enforcement officers, the Defendant called Mr. Dobson's girlfriend. Mr. Dobson spoke briefly with the Defendant during this call and asked him why this incident had become such a big deal. The Defendant informed him that he had received oral sex from the woman and that he had to use some type of car to get away.

Mr. Dobson testified that law enforcement officers interviewed him again on November 15, 2013. At that interview, Mr. Dobson willingly provided them with a DNA

sample.  Mr. Dobson said he was formally charged as a co-defendant to the aggravated robbery and burglary.  He gave another statement to police, providing them the information from his phone call with the Defendant and also giving them an address where they may find the stolen property.  He described this place as an apartment near TSU that was leased by "Charlie Brown" and where he and his friends would "hang out" during that summer before the incident.  Also living with Mr. Brown where two roommates, and Mr. Dobson believed their names were Devon and Jordan Williams.  Mr. Dobson described the Defendant and Mr. Frelix as friends with Mr. Brown.  Mr. Dobson said that he had seen the Defendant at this location before October 15, but not after that date because Mr. Dobson had not returned to the apartment since the incident.

Mr. Dobson said that he had never seen the victim or been into her home.  He said he never took her property or her car.  He then said that the Defendant referred to him by the nickname, "Rue."  During cross-examination, Mr. Dobson testified that, at the time of this offense, he wore his hair in long "dreads."  During redirect examination, Mr. Dobson testified that, at the time that police officers were talking with Mr. Frelix, he could have gone the opposite direction and not approached them.  The officers had not seen him at this point, but he still chose to return to speak with them.

Charles Brown testified that, around the time of these events, he lived, went to school, and worked in Nashville.  He lived near TSU with two roommates, "Anthony" and Jordan Williams in the Village on the Green apartments.  At the time of trial, he maintained the same employment and was still attending school in hopes of obtaining his degree in business administration with a minor in architectural engineering.  Mr. Brown said that he knew the Defendant, "Quan," as an acquaintance, in part because people frequently spent time at his apartment.  The Defendant, he said, was better friends with Mr. Williams.  Mr. Brown said that he also knew Mr. Dobson, whom he called "Rue," and Mr. Frelix from TSU.

Mr. Brown recalled the Defendant coming to his home in October 2013.  He said that the Defendant, who was alone, brought in some laptops and a guitar.  Mr. Brown said that he told the Defendant that he knew that the Defendant had not paid for the laptops and that they were not his.  He told the Defendant that the laptops could be tracked and to take them away from his apartment.  The Defendant left the guitar in the hall closet and then left with the laptops.  Mr. Brown said that he never saw the Defendant or the laptops again.

Mr. Brown said that, a month later, the police came to his apartment and asked to search it.  He consented, and they found the guitar.  Mr. Brown said that he explained to police what had happened and that the Defendant had brought the guitar to his apartment.

During cross-examination, Mr. Brown agreed that he may have written down on a statement that the Defendant brought the guitar in "September" but it was actually October. He said that, when the Defendant came to his home, it was around 11:30 p.m., and Mr. Brown had just arrived home from work. Mr. Brown said that there was no one else at home.

Detective Jeff Wiser, with the Sex Crimes Unit of the Metropolitan Nashville Police Department, testified that he assisted Detective Mike Bennett in this investigation. He said that he showed the victim two photographic lineups the day after the incident, October 16, 2013. The first lineup contained six photographs, one of a man they suspected as being involved. The victim did not identify anyone's picture as being of the man who had assaulted her. Detective Wiser interviewed the victim and reviewed the police report about the welfare check on the men in the Buick that had run out of gas. He then showed the victim a second lineup that contained a photograph of Mr. Dobson and five men that looked similar to him. The victim did not identify any of the pictures as being of her assailant. On the same day that Detective Wiser got word that the victim's car had been located in an apartment complex, Village on the Green, on Ed Temple Boulevard. Officers retrieved the victim's vehicle for processing.

Detective Wiser said that he interviewed Mr. Dobson on November 15, 2013. Mr. Dobson was "very cooperative" and told the detective a recount of the events similar to his trial testimony, including the telephone call from the Defendant detailing part of the assault. Mr. Dobson took them to Mr. Brown's address, which the detective noted was in the same apartment complex where the victim's vehicle had been located. The detective confirmed Mr. Brown's testimony, saying that Mr. Brown told him about the Defendant bringing computers to his home and leaving a guitar in his hall closet.

Detective Wiser testified that there was no sperm detected as a result of the victim's medical exam. There was also no DNA detected in the glass collected from the victim's home or on her shorts.

Detective Andrew Vallee, a Special Agent with the TBI, testified that, at the time of this incident, he worked as a detective for the Metropolitan Nashville Police Department. As a detective, he investigated the victim's report of a robbery and assault. He said that Detectives Wiser and Bennett focused on the sexual assault investigation and he focused on the robbery aspect of the incident. On the day of the offense, he responded to the scene and spoke with the victim briefly.

The detective also spoke with Mr. Dobson, who gave him a statement similar to Mr. Dobson's trial testimony. On this basis, he compiled a photographic lineup that included the Defendant's photograph. At the time, he was unaware that Detective

14

Bennett had compiled and shown the victim a separate photographic lineup that included the Defendant's photograph. Detective Vallee said that he showed the victim the lineup, which was in color, on October 18, 2013. She immediately pointed to the photograph of the Defendant as being a photograph of her assailant.

Detective Vallee testified that he also inputted the serial number of the gun found in the crawl space into his computer database. The gun, a Lorcin .380, was registered to the Defendant's father, Felix Bertrand. The gun records showed that it was purchased from a pawn shop.

The detective said he also investigated the license tag displayed on the Buick. He said that the license tag number did not belong to that vehicle. It was an expired tag that was registered to Felix Bertrand, the Defendant's father. The Ohio license tag that officers found in the backseat of the Buick, belonged to a "Justin Howell." This tag also did not belong to the Buick.

Detective Vallee confirmed that Mr. Dobson informed him in a later interview that stolen property may be at Mr. Brown's apartment. The detective followed up, and found the guitar at the apartment.

During cross-examination, the detective testified that he was unsure whether he consulted with Detective Bennett before he created his own photographic lineup. He said he did not believe that he viewed the lineup Detective Bennett created before he created his own. He agreed that he included some men who had short hair despite the victim's description, explaining that people's appearances change. He noted that there were other photographs with men who had longer hair also in the lineup. Detective Vallee agreed that Detective Bennett's lineup contained photographs of men who all had longer hair. It was also black and white rather than in color.

Several crime scene investigators with the Metropolitan Nashville Police Department testified. Lisa Whitaker testified that she processed the victim's vehicle on October 16, 2013. In the vehicle she found a black glove upon which there was white plastic. She also collected from the vehicle: a phone charger; a Comcast receipt; an Emerson brand of headphones; and DNA swabs of multiple areas. Felicia Evans testified that she processed the interior of the residence by photographing it and collecting evidence. She photographed the gun in the crawlspace of the apartment, collected it, and confirmed that it contained no ammunition. Ms. Evans testified that she photographed and collected a glass that the victim had spit into after the incident. She photographed the Buick, including its license plate, which was still parked near the crime scene. Due to an impending storm, Ms. Evans processed the exterior for latent fingerprints and successfully obtained some. Ms. Sharon Tilley and Ms. Rhonda Evans processed the

15

Buick on October 18, 2013, pursuant to a search warrant that officers had obtained for the vehicle. Of note inside the vehicle she found: a white latex glove; an Ohio license plate lying on the backseat; a backpack containing more latex gloves; other backpacks; and electronic devices. Ms. Tilley and Ms. Evans said that, inside backpacks that were in the vehicle, they found a paycheck from Fed-ex bearing the Defendant's name and a yellow and black shirt that had a tag with the Defendant's name on it. Ms. Tilley also photographed two baby bottles that were in the vehicle. The two investigators processed the interior of the vehicle for latent fingerprints.

Linda Wilson, an employee at the Metropolitan Nashville Police Department Crime Laboratory, testified that she analyzed the latent fingerprint evidence in this case. Ms. Wilson found that Mr. Frelix, Mr. Dobson, and the Defendant all left latent prints on the Buick. On cross-examination, Ms. Wilson agreed that she could not determine when the prints were left.

For the Defendant, Angela Bertrand, his mother, testified that the Defendant was uncircumcised. She further testified that her husband had reported stolen the gun that law enforcement officers found in the crawl space, which was registered to her husband.

The Defendant testified that on October 15, 2013, sometime before noon, he, Mr. Dobson, and Mr. Frelix met some friends outside of Mr. Brown's apartment. The men were talking about who would take what car that day. The Defendant said that he owned a two-seater car and his friend, Justin Howell, owned a four-door Buick. They decided to switch cars since Mr. Howell was going to school by himself. The Defendant said that he, Mr. Dobson, and Mr. Frelix got into Mr. Howell's car and decided to go to the Defendant's house. The Defendant explained that he had not been home the night before, so he needed to shower and change for the new day.

The Defendant recalled that, after showering and changing, the men went to a strip mall in Hermitage, looking for items for the Defendant's room. They then went to Opry Mills Mall. The Defendant said that they left the mall and headed to Southern Thrift Store in Hermitage to look for room decorations. The Defendant said that Mr. Frelix and Mr. Dobson dropped him off near the store, and he walked the rest of the distance to the store. The Defendant said that there had been a "mix up" among the men. He explained that they had borrowed Mr. Howell's car with the agreement that they would fill up his gas tank when done using the car. The Defendant said that, while he had money with him, he said he was not going to fill up the tank, explaining that he was unhappy that this responsibility frequently fell to him. The Defendant said he went into Southern Thrift and purchased a framed picture of the Eiffel Tower.

The Defendant said that he and the other men usually smoked marijuana. He

16

explained the drug "Pluto," saying that a rapper had given that name to children's cough syrup. He explained that adults could ingest an entire bottle of the syrup and "slowly but surely reach a high." The Defendant said he learned about this drug from Mr. Dobson, who had taken the drug and encouraged the Defendant to do so also.

The Defendant testified that, at around 3:00 p.m. that day, he left Southern Thrift and walked home. The Defendant agreed that he left his backpack in the Buick, explaining that he did not need anything from it. The Defendant denied giving Mr. Dobson a gun. The Defendant denied ever entering the victim's apartment. He said he did not rape her, sodomize her, force her to perform oral sex upon him, or threaten her with a weapon. The Defendant said he was uncircumcised. He said that Mr. Dobson lied while testifying and that he had never taken a guitar to Mr. Brown's house. The Defendant said that he had short hair on the day the offenses occurred.

During cross-examination, the Defendant agreed that, at the time of these events, he was friends with Mr. Dobson, and he knew Mr. Frelix and Mr. Brown. He agreed, that day, he was driving around with Mr. Dobson and Mr. Frelix. He said that he sat in the backseat and that Mr. Dobson and Mr. Frelix were in the front seats. The Defendant said that Mr. Frelix did not have a gun with him on the day of this incident and that no one had consumed any "Pluto" on that day. The Defendant said that he carried the Eiffel Tower framed picture over four miles to his house. He agreed that he did not contact Southern Thrift to obtain a video of him there that day and that he had not located his receipt.

The Defendant said that he did not make the report that his father's gun, which he had with him that day, was stolen. He explained that, after this incident and after he was arrested, his father noticed that the gun was missing. The Defendant told his father that Mr. Dobson had been in the house and had access to the gun. The Defendant's father filed a report indicating that the gun had been stolen by Mr. Dobson.

In rebuttal, the victim testified that she had never before seen Mr. Dobson and that he was not the person who raped her. Detective Jeff Wiser testified that before trial that day he showed the victim a photographic lineup that included a picture of Mr. Frelix. The victim did not identify Mr. Frelix's picture as being of her assailant.

Based upon this evidence, the jury convicted the Defendant of aggravated robbery, aggravated burglary, and employment of a firearm during the commission of a dangerous felony. The jury acquitted the Defendant of one count of aggravated rape and was unable to reach a verdict as to two other counts of aggravated rape.

## C. Sentencing Hearing

17

At the Defendant's sentencing hearing, the victim testified that this event had made her scared because she thought that the Defendant was going to kill her. She also worried about her husband coming home and finding her in the condition she was in and how hard that was going to be for him too. The victim said that, even two years later, she found it hard to be home alone. She said that this incident would affect her and her relationships with others for the rest of her life. She asked for the maximum sentence.

Melba Marcrum testified that she lived in Mt. Juliet and worked as the executive director of a non-profit organization. Ms. Marcrum testified that on October 15, 2013, she went to a board meeting for her organization and then went to Opry Mills Mall to shop at Sun and Ski. As she was leaving the mall, she stopped and opened her car door to pour out some water. The Defendant walked toward her and then pulled her car door open. Ms. Marcrum said, "no, no, no," because she realized that he had a gun in his hand with his sleeve pulled over it. Ms. Marcrum said that she was scared and did not want the Defendant to take her purse because she had documentation in it that she needed for a trip with her daughter. The Defendant reached over her, and she took her thumb and pushed it into his eye in an effort to get him to go away. The Defendant then stuck a gun into the side of her neck. Ms. Marcrum said that she assumed that she was going to die.

Ms. Marcrum said that, as it was the middle of the afternoon there were other cars present. The Defendant looked over his shoulder at one of the cars, and Ms. Marcrum turned and kicked the Defendant multiple times. She also screamed until he backed away from her and started walking away. Ms. Marcrum said that the Defendant looked over his shoulder to see if anyone was coming toward them, and Ms. Marcrum closed the door and locked it. She said she saw him walk away in her rearview mirror. She then saw him start to come back toward her, so she put the car into gear and started to drive. When she saw an Opry Mills security car, she started honking the horn until they came. At that point she realized that the Defendant's watch had broken during their struggle and was in her car. She also noticed that her shoe had come off during the struggle and was on the ground near where the struggle had occurred.

Ms. Marcrum testified that the security officer called the police. Police officers showed her a photographic lineup, and, from it, she identified the Defendant's picture as being of the man who assaulted her.

Ms. Marcrum testified that this incident scared her and also caused her to worry about how it would affect her daughters. She had sought counseling for her fear of people approaching her from behind. She said that her fear had affected her daily life.

Based upon this evidence, the trial court sentenced the Defendant to twelve years

for the aggravated robbery conviction, six years for the aggravated burglary conviction, and six years for the employment of a firearm during a dangerous felony conviction. It ordered that all the sentences run consecutively for a total effective sentence of twenty-four years as a Range I offender. He noted that the service of the firearm sentence was mandatory as described by statute.

> I remember this trial very well and I think it lasted three or four days here and I remember the testimony of all of the witnesses beginning with [the victim] and all of these witnesses. I got 10 or 15 pages of notes that I took and I am not going to go over all of those different notes of the whole matter that we had that time, but basically this [D]efendant I think along with two other defendants had already been kind of reported to the police as a suspicious vehicle in the area where this incident ended up happening with [the victim] and they were there with a car and they had some excuse about it running out of gas or whatever else it was and some way he eased through that initial inquiry or investigation or whatever it was.

> I remember the testimony of [the victim] who testified here about what happened. She was getting ready to go to work and apparently, if I remember right, had to go back in the house to get something in connection with leaving before she wanted to take with her and then she was confronted by this defendant and she testified about the whole day and what all happened and this defendant ended up being convicted of aggravated robbery, aggravated burglary and employing a firearm during a dangerous felony.

> He had two other cases I think that there was a mistrial on having to do with aggravated rape, so I am just going to consider today for the purpose of this hearing the aggravated robbery, the aggravated burglary and the firearm and then consider the appropriate sentence in that.

> The Court finds in this case without belaboring this any longer than necessary that there are three enhancement factors that relate to the sentence that is appropriate in this case. Number 1, the Court is going to find that the [D]efendant was a leader in the commission of these offenses involving two or more people. There were two more people with him I think outside in a car, one of them was coming around some crawl space or something another. I remember so many details of it, but I do think this man who had a nickname that was called out that had a bearing on the whole case and its investigation, so I think he was more or less the leader between these three other guys, two other guys.

19

The case not only involved an aggravated robbery and aggravated burglary and a weapon, but I think if I am remembering this right that the car of [the victim] was taken in connection with this incident and found at like Village by the Green or someplace near, forget the exact street. In other words, her car was recovered in connection to the defendant. There was a guitar that was taken from [the victim's] residence that I think was recovered, some property was taken to a man's place and I forget his name right now but I have got it all down here, who took it and somehow kept it there and when the police came and did a search warrant found the guitar that was identified as her guitar and so there is all kinds of evidence against this man right here. There is no question about it, but the Court finds that as to all of the counts that the enhancement factors as I started to say here was that this was the leader, this offense, under number 7, 40-35-114 involved a victim, . . . clearly a victim, a person who was in their own home, had no connection with this man, nothing at all that led her to be knowing him other than him come barging in her house when she is trying to leave to go to work, so I think she was the victim and this offense, all of it, had to do with gratifying this [D]efendant's desire for pleasure or excitement; and number 10 the Court finds that the defendant had no hesitation about committing a crime when the risk to human life was high. He is putting a gun right in this woman's face, fortunately she wasn't shot or killed, but that is part of it as well.

As far as the 40-35-115 based on all of the circumstances of this case, I know this man is a young man, and I appreciate what you had to say, [defense counsel], I think you handled this in a way just to bring some points out about your experiences or whatever, but I do think that this young man here is a dangerous offender by all the activity that took place on that day and whatever else, but I am not getting into whatever else, but the defendant I find is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high, that fits this case, so the Court without belaboring this any further and going into all of the details of all of these notes that I have got here, when I have got plenty of them that will be made part of the record is going to put the sentence into effect now. . . . [Defendant] the jury finds you guilty in aggravated robbery charge in count four, it is a class B felony and the maximum sentence for that is 12 years and that is the sentence that you are going to get in this case.

Count five aggravated burglary, that carries a sentence of between 3

20

and 6 years and the sentence in your case under the aggravating circumstances of this whole day, this whole afternoon, this nightmare in this woman's life [the victim] is going to be six years. The firearm case with a dangerous felony, a class C felony has a mandatory six year sentence and that is the sentence in this case and the Court under section 40-35-115 believes that every one of these convictions that happened on that day, [the victim] being the victim are cases that should be run consecutively, so the sentence is going to be a sentence all together of 18, 24 years, a range 1 offender, but one of them is a mandatory sentence to serve, but I think this is a case that deserves the maximum sentence for what this woman was put through . . . .

The Defendant appeals the judgments of the trial court.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it admitted the victim's identification of him; (2) the evidence is insufficient to sustain his convictions; and (3) the trial court erred when it sentenced him to the maximum sentences within his range and ordered his sentences to run consecutively.

## A. Motion to Suppress Photo Lineup

The Defendant asserts that the trial court erred when it denied his motion to suppress the victim's identification during the second photographic lineup. The Defendant contends that the victim's identification of him from the photographic lineup was tainted because law enforcement officers used unduly suggestive procedures during the lineup. The Defendant notes that the victim viewed multiple lineups and that he was the only individual whose photograph was shown to her repeatedly. He further asserts that the totality of the circumstances weighs against the reliability of the identification in this case. The State counters that the trial court properly admitted the victim's identification of the Defendant because the lineup was not unnecessarily suggestive and that, even if suggestive, the identification was still reliable considering the totality of the circumstances.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded 'the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that

evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Supreme Court has recognized that although perils exist in identifying suspects through use of photograph lineups, identification from photographs can be an effective method "from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs." *Simmons v. United States*, 390 U.S. 377, 384 (1968). As the *Simmons* Court recognized, potential for misidentification increases when a photograph is "in some way emphasized" or "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." *Id*. at 383. The *Simmons* Court held that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id*. at 384; *see Sloan v. State*, 584 S.W.2d 461, 466 (Tenn. Crim. App. 1978). "[A] photographic identification is admissible unless, based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law.'" *State v. Hall*, 976 S.W.2d 121, 153 (Tenn. 1998) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967)).

The relevant guidelines for assessing whether evidence of an identification from a photograph lineup is admissible were announced in *Neil v. Biggers*, 409 U.S. 188 (1972). The *Biggers* two-part analysis requires, first, that the trial court determine whether the identification procedure was unduly suggestive. *Id*. at 198. "To be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." *State v. Cribbs*, 967 S.W.2d 773, 794 (Tenn. 1998); *see Simmons*, 390 U.S. at 383. If the identification procedure was unduly suggestive, the second question is whether the identification was reliable despite the undue suggestion. *Biggers*, 409 U.S. at 198-99. The *Biggers* majority identified five factors to be considered in making that determination:

22

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Id*. at 199-200. If, upon consideration of the *Biggers* factors, the court determines that the identification procedure was so unduly suggestive that it violated the defendant's due process rights, evidence of the identification must be excluded. *State v. Shanklin*, 608 S.W.2d 596, 598 (Tenn. Crim. App. 1980).

The Defendant argues that the lineup was unduly suggestive because the victim viewed multiple lineups, and he was the only person depicted in both lineups. The Defendant notes that the victim could not successfully identify his photograph in the first lineup that officers showed to her that contained his photograph. Then, when shown a second lineup containing his photograph, she immediately identified him. He attributes her immediate identification of him to the fact that he was the only person to appear in both lineups. He goes on to state that the totality of the circumstances weighs against her identification because she only viewed him for a few seconds, she was focused on his weapon, and her description was too general to support her identification.

As stated above, the *Biggers* two-part analysis requires, first, that the trial court determine whether the identification procedure was unduly suggestive, meaning that it was conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification. *See Biggers*, 409 U.S. at 198; *Cribbs*, 967 S.W.2d at 794. We conclude that the photographic lineup was not unduly suggestive. This case was assigned to two different detectives: Detective Vallee investigated the property portion of the case and Detective Bennett investigated the sex offense allegations. The day after the offense, Detective Bennett showed the victim a photographic lineup that included the Defendant's photograph. To ensure that the photographs in the lineup appeared similar, he included photographs of men who looked similar to the Defendant and he showed it to her in black and white only. The Defendant appeared smiling in this photograph and, while the victim was 95% certain it was him, she did not identify anyone as her assailant. Detective Vallee, unaware that the victim had already seen a photographic lineup, created his own photographic lineup. He chose a picture of the Defendant in which the Defendant appeared unsmiling. To ensure that the photographs in the lineup appeared similar, he included photographs of men who looked similar to the Defendant and used other driver's license photographs so that the backgrounds matched. The victim immediately identified the Defendant's picture. We conclude that these lineups were not conducted in such an impermissibly suggestive

manner as to create a substantial likelihood of irreparable misidentification.

Moreover, the totality of the circumstances reflects that the victim's identification was reliable. *See Biggers*, 409 U.S. at 199. First, it was light outside when she saw the Defendant, and she looked at him while he walked toward her across her living room, which she estimated took five seconds. While her description of this was general, it was accurate. She was 100% certain of her identification of the Defendant when she saw his unsmiling picture three days after the robbery. We conclude that the trial court did not err when it denied the Defendant's motion to suppress, and the Defendant is not entitled to relief on this issue.

## B. Sufficiency of Evidence

The Defendant next contends that the evidence is insufficient to sustain his conviction for aggravated robbery, aggravated burglary, and employment of a firearm during the commission of a dangerous felony. He states that the identification of him was "uncertain and skeptical" and that there was no proof that he intended to commit a theft or assault when he entered the victim's home. He further denies that he took any items using his weapon as a threat. The State counters that the jury based its verdicts on sufficient evidence. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

24

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

Aggravated robbery is robbery accomplished with a deadly weapon. T.C.A. § 39-13-402(a)(1) (2014). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a) (2014). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. T.C.A. § 39-14-103(a) (2014). Violence is defined as "physical force unlawfully exercised so as to damage, injure or abuse." *State v. Fitz*, 19 S.W.3d 213, 217 (Tenn. 2000). Pointing a weapon satisfies the element of violence. *State v. Allen*, 69 S.W.3d 181, 186 (Tenn. 2002). Fear is "fear of present personal peril from violence offered or impending." *State v. Bowles*, 52 S.W.3d 69, 80 (Tenn. 2001).

The victim, who had left her home to go to work, returned to her home after forgetting to close the door between her home and her garage. She left the front door open, and when she turned around, the Defendant was on her front door step. He entered her home brandishing a weapon. He placed his hand over her mouth and asked her if anyone was home, saying he would kill anyone else there. The Defendant pointed the gun at her and told her that he would kill her if she moved. He then told her to remain where she was or he would kill her. He told her that if she left the home his friend, "Rue," was waiting outside to kill her. The Defendant then, without the victim's consent, took laptop computers and a guitar from her home, forced her into a bathroom, and left the victim's home in her car. This is sufficient evidence to support the Defendant's aggravated robbery conviction.

Aggravated burglary occurs when a person, without the effective consent of the property owner, enters a habitation with the intent to commit a felony, theft, or assault or enters a building and commits or attempts to commit a theft. T.C.A. §§ 39-14-403(a); 39-14-402(a)(1) (2014). The evidence, viewed in the light most favorable to the State, showed that the Defendant was with two of his friends, Mr. Dobson, nicknamed "Rue," and Mr. Frelix. The men's vehicle ran out of gas a short distance from the victim's home. Mr. Dobson confirmed that he saw the Defendant, who was armed, go toward the victim's home shortly before this offense with the intent to get gas money. The victim recalled that the Defendant referred to a man outside by the nickname "Rue." The Defendant entered the victim's home, threatened her with a weapon and stole items from her, leaving in her car. This evidence sufficiently supports the Defendant's aggravated burglary conviction.

As to the Defendant's conviction for employing a firearm during the commission of a dangerous felony,

> (a) It is an offense to possess a firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony.

> (b) It is an offense to employ a firearm during the:

> (1) Commission of a dangerous felony;

> (2) Attempt to commit a dangerous felony;

> . . . .

> (c) A person may not be charged with a violation of subsection (a) or

26

(b) if possessing or employing a firearm is an essential element of the underlying dangerous felony as charged. In cases where possession or employing a firearm are elements of the charged offense, the state may elect to prosecute under a lesser offense wherein possession or employing a firearm is not an element of the offense.

Aggravated burglary is a dangerous felony pursuant to the statute. T.C.A. § 39-17-1324(i)(1)(H) (2014).

The evidence, viewed in the light most favorable to the State, proved that the Defendant entered the victim's home brandishing a weapon with the intent to steal items from her home. As discussed above, he committed aggravated burglary, and he employed a gun when so doing. This is sufficient to support his conviction for employing a firearm during the commission of a dangerous felony.

To the extent the Defendant contends that the evidence is insufficient to prove his identify as the perpetrator of these offenses, we disagree. As previously stated, the Defendant was driving around with his friends Mr. Dobson and Mr. Frelix. Their car ran out of gas near the victim's home. Mr. Dobson said the Defendant left the vehicle carrying a gun and traveling toward the victim's home. Mr. Dobson saw the Defendant on the victim's front porch step and then turned and saw the police at the car, so he returned to the vehicle where he interacted with the police and then left the area by bus. The Defendant entered the victim's home brandishing a weapon and telling her that his cohort "Rue" would kill her if she left the house. The Defendant proceeded to take items from her home and left in her car. Mr. Brown testified that the Defendant came to his home on the day of this offense and brought multiple items, which matched the description of the items taken from the victim's home. He told the Defendant not to leave these items at his apartment, but the Defendant left a guitar. Law enforcement officers found the victim's car in Mr. Brown's parking lot and the victim's guitar in Mr. Brown's closet. When speaking with Mr. Dobson after the offenses, the Defendant told Mr. Dobson that this case had received so much media attention because he had asked the victim to give him oral sex and that he had stolen her car. The victim identified the Defendant from a photographic lineup and in court. This evidence sufficiently supports the Defendant's identity as the perpetrator of these offenses. He is not entitled to relief on this issue.

## C. Sentencing

The Defendant contends that the trial court erred when it sentenced him. He asserts that the trial court misapplied the enhancement factor, that he was a leader in the commission of this offense, and the enhancement factor that these offenses were

committed to gratify the Defendant's desire for pleasure. He further contends that he was not a "dangerous offender" so as to support consecutive sentencing. The State contends that the Defendant's sentence is proper, and we agree.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence and the manner of service of that sentence. In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. 380 S.W.3d 682 (Tenn. 2012). The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id*. at 708. A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*.; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).

Thus, the reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id*. at 707. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

28

A. The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

B. The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c).

Although the trial court should also consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. *See* T.C.A. § 40-35-114 (2014); *see also Bise*, 380 S.W.3d at 699 n. 33, 704; *Carter*, 254 S.W.3d at 343. We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

After review of the record, we cannot find that the record is void of any substantial evidence to support the trial court's decision. Even were we to agree with the Defendant's contention that the trial court misapplied any enhancement factors, the Defendant would still not be entitled to relief. The trial court considered the applicable enhancement and mitigating factors and it sentenced the Defendant within his applicable sentencing range that is consistent with the purposes and principles of the Sentencing Act.

With regard to his consecutive sentences, we review a trial court's decision to impose consecutive sentences for an abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. One of those criteria is that the defendant is a "dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a

crime in which the risk to human life is high. T.C.A. § 40-35-115. The imposition of consecutive sentencing, however, is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" T.C.A. § 40-35-103(2), (4). Further, when based on the "dangerous offender" criterion, the court must also determine that the aggregate sentence is (1) reasonably related to the severity of the offense and (2) necessary to protect the public from further crimes. *See State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995).

We start with the understanding that the sentence for employment of a firearm during the commission of a dangerous felony is required by statute to run consecutively to the underlying felony. T.C.A. § 39-17-1324(e)(1). Therefore, the sentence for the employment of a firearm must run consecutively to the aggravated burglary sentence. Further, the trial court did not abuse its discretion when it determined that the aggravated robbery sentence should also run consecutively to the other two sentences. At the Defendant's sentencing hearing, a victim of a separate offense occurring on the same day as this incident testified. She said that the Defendant had attempted to rob her at gunpoint on the same day, before he robbed the victim. He pointed a gun at her in broad daylight while she was in her vehicle in a parking lot and attempted to steal her purse. She successfully fended him off. He then used that same weapon to gain access into the victim's home and steal items from inside. The presentence report included facts that recounted the Defendant's involvement in two other armed robberies that same week, one of which was the robbery of an elderly woman. We infer from the trial court's statements at sentencing that it found that the *Wilkerson* factors supported consecutive sentencing, and we agree that the facts of the case support such a sentence. The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE